# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 25, 2007 Session Heard at Maryville[1]


# JEREMY FLAX ET AL. v. DAIMLERCHRYSLER CORPORATION ET AL.


**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Davidson County**
**No. 02C-1288     Hamilton V. Gayden, Jr., Judge**

---

**No. M2005-01768-SC-R11-CV - Filed July 24, 2008**

---

The plaintiffs filed this products liability case against DaimlerChrysler seeking damages for the wrongful death of their son and for emotional distress suffered by the mother. The plaintiffs also sought punitive damages. We granted review to determine: 1) whether a negligent infliction of emotional distress claim brought simultaneously with a wrongful death claim is a "stand-alone" claim that requires expert medical or scientific proof of a severe emotional injury; 2) whether the evidence presented at trial was sufficient to support an award of punitive damages; 3) whether the punitive damages awarded by the trial court were excessive; and 4) whether the trial court erred by recognizing the plaintiffs' second failure to warn claim. We hold that the simultaneous filing of a wrongful death suit does not prevent a negligent infliction of emotional distress claim from being a "stand-alone" claim. Therefore, negligent infliction of emotional distress claims brought under these circumstances must be supported by expert medical or scientific proof of a severe emotional injury. In addition, we conclude that the punitive damages awarded by the trial court were adequately supported by the evidence and were not excessive. Finally, we hold that the trial court erred by recognizing the plaintiffs' second failure to warn claim but conclude that the error did not prejudice the judicial process or more probably than not affect the jury's verdict. Accordingly, we affirm the Court of Appeals' reversal of the compensatory and punitive damage awards based on the negligent infliction of emotional distress claim and reverse the Court of Appeals' decision to overturn the punitive damage award related to the plaintiffs' wrongful death claim.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals**
**Affirmed in Part and Reversed in Part**

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., joined. CORNELIA A. CLARK, J., concurring in part and dissenting in part. GARY R. WADE, J., concurring. WILLIAM C. KOCH, JR., J., concurring in part and dissenting in part.

---

[1] Oral argument was heard in this case in Maryville, Blount County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Alan J. Hamilton, George W. Fryhofer, III, James E. Butler, Jr., and Leigh Martin May, Atlanta, Georgia, and Gail Vaughn Ashworth, Nashville, Tennessee, for the Appellants, Jeremy Flax and Rachel Sparkman.

Dominic Lanza and Theordore J. Boutrous, Jr., Los Angeles, California; James C. Ho, Dallas, Texas; Thomas H. Dupree, Jr., Washington, D.C.; and Joy Day and Lawrence A. Sutter, Franklin, Tennessee, for the Appellee, DaimlerChrysler Corporation.

Louis A. Stockell, Jr., Madison, Tennessee, Pro Se.

Allison Orr Larsen, K. Lee Blalack, II, and Matthew M. Shors, Washington, D.C., for the Amicus Curiae, Alliance of Automobile Manufacturers.

Christopher Landau and Robin S. Conrad, Washington, D.C., and John Randolph Bibb, Jr., Nashville, Tennessee, for the Amicus Curiae, The Chamber of Commerce of the United States of America.

Jonathan M. Hoffman, Portland, Oregon, and Linda J. Hamilton Mowles, Knoxville, Tennessee, for the Amicus Curiae, The Product Liability Advisory Council, Inc.

## OPINION

## I. Facts and Procedural History

On June 30, 2001, Rachel Sparkman and her eight-month-old son, Joshua Flax, were passengers in a 1998 Dodge Grand Caravan ("the Caravan") operated by Ms. Sparkman's father, Jim Sparkman. Ms. Sparkman was seated in a captain's chair directly behind the driver's seat. Joshua Flax was restrained in a child safety seat in the captain's chair directly behind the front passenger's seat, which Joe McNeil occupied.

As Mr. Sparkman turned left from a private drive onto a public road, the Caravan was rear-ended by a pickup truck driven by Louis Stockell. According to the testimony of the accident reconstruction experts, the pickup truck was traveling between fifty and fifty-six miles per hour at the time of impact. The Caravan was traveling in the same direction at a speed between ten and fifteen miles per hour. At the moment of the impact, the Caravan experienced a change in velocity of approximately seventeen to twenty-three miles per hour. Accident reconstruction experts for both parties testified that Mr. Sparkman was not responsible for the accident and that the accident would not have occurred if Mr. Stockell had not been driving at an excessive speed.[2]

---

[2] The plaintiffs' expert testified that Mr. Stockell originally was traveling at approximately sixty miles per hour, and the defendant's expert testified that Mr. Stockell was traveling at approximately seventy miles per hour. The posted speed limit on the public road at the time of the accident was thirty-five miles per hour.

Upon impact, the backs of the seats containing Mr. Sparkman, Ms. Sparkman, and Mr. McNeil yielded rearward into a reclining position. Tragically, the front passenger's seatback collapsed far enough to allow the back of Mr. McNeil's head to collide with Joshua Flax's forehead. The collision fractured Joshua Flax's skull and caused severe brain damage. None of the other passengers in the Caravan suffered serious injuries. Experts for both parties acknowledged that Joshua Flax would not have been seriously injured if the seat in front of him had not yielded rearward.

Immediately after the Caravan came to a rest, Ms. Sparkman checked on her son's condition and saw that his forehead had been, in her words, "smashed in." Michael Loftis, one of the first people to arrive at the scene of the accident, testified that he saw Ms. Sparkman outside the vehicle holding Joshua Flax. Because he believed Ms. Sparkman was "kind of hysterical" and could have accidentally caused further injury to Joshua Flax, Mr. Loftis offered to hold the child. Although initially reluctant, Ms. Sparkman agreed to give her son to Mr. Loftis. At this point, Mr. Loftis first observed that Joshua Flax had "a hole in his forehead approximately the size of a golf ball and probably a half inch deep." A short time later, Joshua Flax was transported to the hospital by ambulance. He died of his injuries the next day.

On May 7, 2002, Ms. Sparkman and Joshua Flax's father, Jeremy Flax, filed a complaint against Mr. Stockell[3] and DaimlerChrysler Corporation ("DCC"), the manufacturer of the Caravan. The complaint alleged that the Caravan's seats are defective and unreasonably dangerous, that DCC failed to warn consumers that the seats pose a danger to children seated behind them, and that DCC is strictly liable under the Tennessee Products Liability Act of 1978. Tenn. Code Ann. §§ 29-28-101 to -108 (2000). The plaintiffs further alleged that the condition of the seats and the failure to warn proximately caused Joshua Flax's death and caused Ms. Sparkman to suffer severe emotional distress. Finally, the plaintiffs alleged that punitive damages are warranted because DCC acted intentionally and recklessly in manufacturing, marketing, and selling the Caravan.

After a lengthy trial, the jury found that the seats were defective and unreasonably dangerous, that DCC failed to warn the plaintiffs about the dangers of the seats at the time of sale, that DCC failed to warn plaintiffs about the dangers of the seats after the sale, and that DCC acted recklessly such that punitive damages should be imposed. The jury apportioned half of the fault to DCC and the other half to Mr. Stockell. Finally, the jury awarded $5,000,000 to the plaintiffs for the wrongful death of Joshua and $2,500,000 to Ms. Sparkman individually for negligent infliction of emotional distress ("NIED").

After the second stage of the trial, the jury awarded $65,500,000 in punitive damages to the plaintiffs for the wrongful death of Joshua Flax and $32,500,000 in punitive damages to Ms.

---

[3] Mr. Stockell failed to attend his scheduled deposition and failed to respond to DaimlerChrysler's interrogatories and request for production of documents. As a sanction, Mr. Stockell was prohibited from testifying at trial and from raising a defense against the plaintiffs' claims. In addition, the trial court instructed the jury that Mr. Stockell was at fault. Mr. Stockell is not a party to this appeal, and neither party has appealed any findings of fact or conclusions of law with respect to Mr. Stockell.

Sparkman individually for NIED. Following the jury's verdict, the trial court conducted a review of the jury's award of punitive damages as required by Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 902 (Tenn. 1992). In its findings of fact and conclusions of law the trial court concluded that "the jury properly found that Daimler Chrysler [sic] acted recklessly and that punitive damages were warranted." The trial court also concluded that the jury's award of punitive damages was excessive because there was a very large discrepancy between the punitive damages, totaling $98,000,000, and the compensatory damages for which DCC was liable, totaling $3,750,000. Accordingly, the trial court reduced the punitive damages to $20,000,000, a remittitur of $78,000,000. In its final order, the trial court indicated that the plaintiffs were entitled to $13,367,345 in punitive damages for the wrongful death of Joshua Flax and that Ms. Sparkman was individually entitled to $6,632,655 in punitive damages for NIED.

On appeal, the Court of Appeals concluded that Ms. Sparkman's NIED claim was subject to the heightened proof requirements set forth in Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996). The Court of Appeals reversed the jury's award of compensatory and punitive damages related to Ms. Sparkman's NIED claim against DCC because the plaintiffs did not satisfy the heightened proof requirements for a "stand-alone" NIED claim. In addition, the Court of Appeals concluded that there was not clear and convincing evidence that DCC acted recklessly or intentionally. Accordingly, the Court of Appeals reversed the trial court's award of all remaining punitive damages. Finally, the Court of Appeals affirmed the trial court's award of $5,000,000 in compensatory damages for the wrongful death of Joshua Flax. The plaintiffs appealed the ruling of the Court of Appeals. We granted review.

## II. Negligent Infliction of Emotional Distress

We begin our analysis with Ms. Sparkman's NIED claim. Our modern jurisprudence concerning NIED began with Camper. In that case, the plaintiff was operating a cement truck when a vehicle operated by the defendant pulled in front of him. The defendant was killed immediately in the resulting collision. Although the plaintiff suffered only minor physical injuries, he filed an NIED claim alleging that he suffered emotional injuries from viewing the defendant's body immediately after the accident.

We began our analysis in Camper by recognizing that the law governing NIED

> is fundamentally concerned with striking a balance between two opposing objectives: first, promoting the underlying purpose of negligence law–that of compensating persons who have sustained emotional injuries attributable to the wrongful conduct of others; and second, avoiding the trivial or fraudulent claims that have been thought to be inevitable due to the subjective nature of these injuries.

Id. at 440. We then catalogued a variety of approaches used in other jurisdictions to meet these two opposing goals. Some jurisdictions held that a plaintiff could not recover for NIED unless he or she suffered a "physical impact" caused by the defendant's negligent conduct. Id. Other jurisdictions

allowed a plaintiff to recover for NIED if the plaintiff suffered a "physical manifestation" of the emotional injury. Id. at 442. Still other jurisdictions required that the plaintiff be in the "zone of danger" created by the defendant's negligent conduct. Id.

Prior to our decision in Camper, Tennessee applied a version of the "physical manifestation" rule. Id. at 443; see also Memphis State Ry. Co. v. Bernstein, 194 S.W. 902, 902 (Tenn. 1917). Unfortunately, the "physical manifestation" rule discouraged compensation for some meritorious claims by "ignor[ing] the fact that some valid emotional injuries simply may not be accompanied by a contemporaneous physical injury or have physical consequences." Camper, 915 S.W.2d at 446. Accordingly, Tennessee courts had "continually found it necessary to deviate from the 'physical manifestation' rule by either formally creating exceptions to the rule or by applying the rule in a nonrigorous fashion." Id. at 445. To increase the fairness, clarity, and predictability of the law governing NIED, we abandoned the "physical manifestation" rule and adopted new requirements designed to distinguish between meritorious and frivolous cases. Id. at 446. Specifically, we held that a plaintiff who has not suffered a physical injury must demonstrate through expert medical or scientific proof that he or she has suffered a "severe" emotional injury. Id. We held that an emotional injury is "severe" if "'a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" Id. (quoting Rodrigues v. State, 472 P.2d 509, 520 (Haw. 1970)). Our holding in Camper therefore balances the goals of compensating victims and avoiding fraudulent claims by:  1) allowing a person with emotional injuries to bring NIED claims regardless of whether he or she has suffered any physical injury, and 2) requiring a higher degree of proof for emotional injuries under these circumstances.

In Ramsey v. Beavers, 931 S.W.2d 527, 530-31 (Tenn. 1996), we reaffirmed the principles set forth in Camper, rejected the argument that the "zone of danger" test could be integrated into our Camper analysis, and held that a plaintiff who saw his mother hit by a car could bring a suit for NIED regardless of whether he was physically injured or placed in immediate danger of being physically injured. Id. We emphasized that to prove his claim the plaintiff was required to present expert medical or scientific evidence that he had suffered a severe emotional injury. Id. at 532. In addition, we held that to recover for emotional injuries sustained as the result of the death or injury of a third party a plaintiff must establish:  1) that he or she was sufficiently near the injury-causing event to allow sensory observation of the event, and 2) that the injury was, or was reasonably perceived to be, serious or fatal.[4] Id. at 531.

We further clarified our holding in Camper in Estate of Amos v. Vanderbilt University, 62 S.W.3d 133 (Tenn. 2001). Amos involved a plaintiff who was infected with HIV during a blood transfusion. The plaintiff received no notice of the possibility that she had been exposed to HIV. Years later, the plaintiff gave birth to a daughter who was infected with HIV in utero. After her

---

[4] Our opinion in Ramsey stated that the closeness of the relationship between the plaintiff and the third party is relevant, but we stopped short of requiring plaintiffs to prove that a close relationship existed. 931 S.W.2d at 531-32; accord Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 54 (Tenn. 2004).

daughter died of an AIDS-related virus, the plaintiff was tested and learned that she had HIV. The plaintiff and her husband filed suit for wrongful birth, negligence, and NIED.

The defendants in Amos cited Camper and argued that the plaintiff was not entitled to recover for emotional injuries because she had failed to present expert or scientific testimony of serious or severe emotional injury. We rejected this argument and held that "[t]he special proof requirements in Camper are a unique safeguard to ensure the reliability of 'stand-alone' negligent infliction of emotional distress claims." Amos, 62 S.W.3d at 136-37. Because "the risk of fraudulent claims is less . . . in a case in which a claim for emotional injury damages is one of multiple claims for damages[,]" we held that the heightened proof requirements set forth in Camper are inapplicable "[w]hen emotional damages are a 'parasitic' consequence of negligent conduct that results in multiple types of damages." Id. at 137. In other words, we recognized a distinction between traditional negligence claims that include damages for emotional injuries and claims that are based solely on NIED.

The plaintiff in Amos alleged that she had suffered emotional injuries caused by her infection with HIV and by the subsequent infection of her daughter. Because the plaintiff's claim of emotional damages was not separate from her other claims of negligence, but rather was "parasitic" to those claims, her claim was properly characterized as a negligence claim that included damages for emotional injuries. As her claim was not based solely on NIED, we concluded that the proof requirements of Camper were inapplicable. Id.

With this history in mind, we now turn to the facts of the instant case. At trial, the plaintiffs failed to present expert medical or scientific proof that Ms. Sparkman suffered severe emotional injuries. DCC filed motions for directed verdict and judgment notwithstanding the verdict, arguing that Ms. Sparkman's NIED claim was invalid because plaintiffs failed to meet the Camper requirements. Plaintiffs argued that the heightened proof requirements of Camper were inapplicable because Ms. Sparkman's NIED claim was filed with a wrongful death claim and was therefore not a "stand-alone" claim. The trial court agreed with the plaintiffs and upheld the jury's verdict with respect to Ms. Sparkman's NIED claim.

On appeal, the plaintiffs continue to argue that the NIED claim is not a "stand-alone" claim because the plaintiffs also brought a wrongful death suit on behalf of Joshua Flax. We disagree. It is well settled that a wrongful death action is a claim belonging to the decedent, not the decedent's beneficiaries. Ki v. State, 78 S.W.3d 876, 880 (Tenn. 2002); see also Tenn. Code Ann. § 20-5-106 (Supp. 2006). "Although the living beneficiaries of the action may seek a limited recovery for their own losses in addition to those of the decedent, the right of action itself remains one that is 'single, entire[,] and indivisible.'" Kline v. Eyrich, 69 S.W.3d 197, 207 (Tenn. 2002) (alteration in original) (citations omitted) (quoting Wheeler v. Burley, No. 01A01-9701-CV-00006, 1997 WL 528801, at *3 (Tenn. Ct. App. Aug. 27, 1997)). Accordingly, the wrongful death claim in the instant case belongs to Joshua Flax rather than to the plaintiffs.

-6-

This case is therefore distinguishable from Amos, a case in which the plaintiff sought to recover for emotional damages parasitic to negligence and wrongful birth claims that were personal to the plaintiff. See Smith v. Gore, 728 S.W.2d 738, 741 (Tenn. 1987) (holding that wrongful birth actions are actions by parents "on their own behalf"). Nothing in our opinion in Amos was intended to allow plaintiffs to avoid the heightened proof requirements of Camper by bringing a separate wrongful death suit on behalf of a decedent. Because Ms. Sparkman's NIED claim is the only claim that is personal to one of the plaintiffs, we must conclude that it is a "stand-alone" claim subject to the requirements of Camper.

Furthermore, this case is not meaningfully distinguishable from our decision in Ramsey, a case in which the plaintiff saw his mother killed when she was hit by a car. We held that to recover for emotional injuries sustained as the result of the death or injury of a third party a plaintiff must present expert medical or scientific proof of a severe emotional injury and establish proximity to the injury-causing event and severity of the injury to the third party. Ramsey, 931 S.W.2d at 531-32. Like the plaintiff in Ramsey, Ms. Sparkman seeks to recover for emotional injuries sustained as a result of witnessing the death of an immediate family member. That the plaintiffs in this case brought a wrongful death suit is not sufficient to exempt the NIED claim from the requirements set forth in Camper and Ramsey because the filing of a wrongful death suit does nothing to demonstrate the reliability of an NIED claim.

The plaintiffs also argue that the NIED claim is valid because Ms. Sparkman suffered minor physical injuries in the accident but chose not to bring a claim for those injuries. This argument has two flaws. First, the plaintiff in Camper also suffered minor injuries for which he did not file a claim. 915 S.W.2d at 439 (quoting the plaintiff's testimony that he suffered a scrape on his knee in the accident). Clearly, the plaintiff's minor injury in Camper did not prevent us from concluding that heightened proof requirements are necessary for NIED claims. See id. at 446. Second, the emotional injuries alleged by Ms. Sparkman are not parasitic to the minor injuries she sustained in the accident but rather are the result of witnessing the death of her child. Even if Ms. Sparkman had chosen to bring a claim for her minor physical injuries, her NIED claim would remain a "stand-alone" claim because the emotional injuries sustained from witnessing the death of her child are completely unrelated to any physical injuries she may have sustained. Of course, Ms. Sparkman would not have been required to meet the Camper requirements to recover for any mental and emotional suffering resulting from her own physical injuries. See Overstreet v. Shoney's, Inc., 4 S.W.3d 694, 715 (Tenn. Ct. App. 1999) (holding that damages for pain and suffering in a personal injury case may include a variety of mental and emotional injuries that accompany the physical injury). When a plaintiff suffers a physical injury there is some indication that allegations of emotional and mental injuries resulting from that injury are not fraudulent. See Amos, 62 S.W.3d at 137. On the other hand, having a potential claim for physical injuries does nothing to ensure the reliability of an NIED claim relating to the emotional injuries resulting from witnessing the death or injury of a third party. Accordingly, there is no good reason to relieve Ms. Sparkman of her burden of meeting the Camper requirements.

Finally, the plaintiffs argue that the heightened proof requirements of Camper are unnecessary in this case because the severity of Ms. Sparkman's emotional injuries is obvious. Although it is axiomatic that witnessing the death of one's child is a horrific experience, it is not at all obvious what impact such an event will have on any particular individual. Indeed, we constructed the Camper requirements precisely because emotional injuries are uniquely subjective. 915 S.W.2d at 440; Amos, 62 S.W.3d at 137. Although sympathy for a particular plaintiff may tempt us to hold that certain circumstances "obviously" result in severe emotional injuries, we must also recognize that such a holding would subvert the principles set forth in Camper and would likely lead to the kind of ad hoc decisions that originally made NIED case law unpredictable and incoherent. Furthermore, we do not believe the requirement that a severe emotional injury be proven by expert medical or scientific evidence is unduly burdensome to those plaintiffs who have suffered legitimate "stand-alone" emotional injuries. Accordingly, we decline to create an exception to the Camper requirements based on the particular circumstances of this case.

Based on the foregoing considerations, we hold that Ms. Sparkman's NIED claim was governed by the heightened proof requirements of Camper. It is uncontested that Ms. Sparkman failed to meet those requirements. We therefore affirm, albeit under slightly different reasoning, the Court of Appeals' reversal of the compensatory and punitive damage awards based on Ms. Sparkman's NIED claim.

### III. Punitive Damages

Several issues relating to punitive damages have been hotly contested throughout the trial and appeal of this case. DCC continues to assert three arguments against the validity of the punitive damages awarded for the wrongful death of Joshua Flax. First, DCC argues that punitive damages are not warranted in this case because the evidence was insufficient to support a finding of recklessness. Second, DCC argues that the award of punitive damages is excessive in violation of the due process standards announced by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003). Finally, DCC argues that the trial court violated the due process requirements of Phillip Morris USA v. Williams, ___ U.S. ___, 127 S. Ct. 1057 (2007), by allowing the jury to consider harm to non-parties when determining the amount of punitive damages to impose against DCC. We address each of these arguments in turn.

*a. Sufficiency of Evidence Supporting Jury's Finding of Recklessness*

DCC argues that the evidence submitted by the plaintiffs was insufficient to support the imposition of punitive damages. A verdict imposing punitive damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992). In Hodges, we held that evidence is clear and convincing when it leaves "no serious or substantial doubt about the correctness of the conclusions drawn." Id. at 901 n.3. We also held that a person acts recklessly when "the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such

a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." Id. at 901. The jury in this case found that there was clear and convincing evidence that DCC's conduct was reckless.

When this Court is called upon to review the reasonableness of a jury's verdict, as we are in this case, we "are limited to determining whether there is material evidence to support the verdict." Id. at 898. In making this determination, we do not re-weigh the evidence. Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d 522, 526 (Tenn. 1985). Rather, we are "required to take the strongest legitimate view of all of the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary." Id. The jury's verdict must be affirmed if any material evidence supports it. Id. Therefore, our review of this issue is limited to determining whether any material evidence supports the jury's conclusion that there is no serious or substantial doubt that DCC consciously disregarded a known, substantial, and unjustifiable risk to the plaintiffs.

To determine whether there is any material evidence supporting the jury's verdict, we must summarize the evidence presented at trial in some detail. At trial, the plaintiffs sought to prove that DCC had known for over twenty years that its seats were defective and unreasonably dangerous but failed to remedy the problem or warn consumers of the danger. DCC countered by arguing that it designed the seats to yield rearward in rear-end collisions to absorb energy from the collision and protect the occupant of the seat. According to DCC, the Caravan design protects the greatest number of people in the greatest number of potential accidents and using stronger seatbacks would increase the danger to occupants of the seat. To further support its argument that its seat design was reasonably safe, DCC repeatedly noted that its seatbacks were similar to those used by other manufacturers and exceeded the federal regulation governing seatback strength, Federal Motor Vehicle Safety Standard 207 ("FMVSS 207").

As part of their effort to demonstrate that the Caravan's seatbacks posed a substantial and unjustifiable risk, the plaintiffs introduced the testimony of Dr. Saczalski, an expert on seat engineering. Dr. Saczalski testified that the Caravan's seats were defective and unreasonably dangerous because they posed a threat to children seated behind them. His testimony was based in part on crash testing he conducted in an attempt to recreate the accident underlying this case. During the crash test, Dr. Saczalski used vehicles of the same make and model as those involved in the accident and attempted to account for the weight, speed, and trajectory of each vehicle. The Caravan used in the crash test contained dummies approximating the size and weight of Mr. Sparkman, Mr. McNeil, Ms. Sparkman, and Joshua Flax. Dr. Saczalski replaced the driver's seat of the Caravan with a seat from a 1996 Chrysler Sebring, a DCC vehicle that had seats with backs approximately five times stronger than the seats used in the Caravan. Dr. Saczalski placed the Sebring seat in the crash test vehicle to demonstrate how a stronger seatback would perform under forces equivalent to those suffered by the Caravan in the actual accident.

Consistent with the circumstances of the actual accident, videos of the crash test show that the front passenger's seat yielded rearward allowing the McNeil surrogate's head to impact the head

of the Joshua Flax surrogate. The Sebring seat also yielded rearward but to a far lesser degree. Significantly, the Sebring seat did not substantially encroach upon the seating area behind it. Dr. Saczalski concluded from the crash test that Joshua Flax would have survived the accident without serious injury had the Caravan been equipped with seats with backs as strong as those of the Sebring seat. Contrary to DCC's assertion that stronger seatbacks impose greater dangers to their occupants in rear-end collisions, the crash test dummy in the stronger Sebring seat experienced less head and neck acceleration than the dummy in the Caravan seat.

Dr. Saczalski also testified regarding several other crash tests he performed in which Sebring seats were placed side-by-side with other DCC minivan seats. These tests also demonstrated that DCC minivan seats have the capacity to cause injury to children seated behind them. The test results support the view that Sebring seats do not pose the same threat because they do not encroach upon the passenger space behind them. Furthermore, Dr. Saczalski testified that the dummy-occupants of the stronger Sebring seats tended to experience less acceleration to the head and neck than the dummy-occupants of weaker seats.

The plaintiffs also made a considerable effort to demonstrate that DCC was aware that the Caravan seats were defective and unreasonably dangerous for at least twenty years. The minutes from a DCC Engineer Safety Committee meeting dated December 10, 1980, appear to contain the first acknowledgment that yielding seatbacks could be a potential problem. In the meeting it was noted that the seatbacks had yielded to some degree in every crash test and that "improvements could be made, but would require development costs and a piece penalty would result." The Engineer Safety Committee did not make any recommendation to improve seatback strength because the seats performed as well as those of DCC's competitors, complied with federal requirements, and had not been demonstrated "to be a significant injury producing problem." Videos of crash testing performed by DCC confirm that in rear-impact collisions the seats yielded into the occupant space behind them. In addition, plaintiffs presented documentation showing that in at least one crash test conducted in 1989 the front seats were braced to prevent the seatbacks from impacting equipment occupying the back seat.

Although the minutes from the 1980 meeting indicate that there was no evidence that the seats were a "significant injury producing problem," DCC soon began to receive new information. According to an employee in DCC's customer relations department, during the mid-1980s, DCC began to receive reports of children injured by yielding seatbacks in rear-end collisions. DCC's records contained documentation of several rear-end collisions in which a yielding seatback caused a child to suffer skull or facial fractures. Other injuries sustained by children seated behind yielding seatbacks were also reported to DCC. In spite of these reports, DCC did not issue any warning to customers and continued to advertise the Caravan as a vehicle specifically designed to protect children.

The most significant testimony regarding DCC's knowledge of the danger presented by the Caravan seats was provided by Paul Sheridan, a former DCC employee. During his employment with DCC, Mr. Sheridan served as the chair of the Minivan Safety Leadership Team ("MSLT"), a

committee formed to address safety concerns in DCC's minivans. The committee was comprised of persons from DCC's safety, engineering, marketing, sales, and design departments. One of the many safety issues the MSLT was formed to address was the issue of seatback strength. According to Mr. Sheridan, the MSLT had available to it complaints regarding injuries caused by yielding seatbacks. At a March 16, 1993, committee meeting, members of the MSLT reached a consensus that it was unacceptable for seats to yield rearward into the passenger space behind them and that the seats were inadequate to protect customers. After the meeting, Mr. Sheridan distributed the minutes of the meeting to various DCC executives. Some time thereafter, Ronald Zarowitz, a member of the MSLT representing DCC's safety office, instructed Mr. Sheridan to retrieve the minutes of the meeting and destroy them. Mr. Zarowitz informed Mr. Sheridan that this order came from Francois Castaing, the head of the engineering department. Mr. Sheridan retrieved the minutes as instructed, but he retained two copies in his office.

After the March 1993 meeting, Mr. Sheridan decided to investigate the seatback issue further. To this end, Mr. Sheridan met with an engineer responsible for seat design and requested the seat design specifications that discussed how the seats were designed to yield. According to Mr. Sheridan, the engineer "didn't know what [he] was asking for" but provided the design specifications of the seats. These specifications did not state that the seats were designed to yield. In fact, Mr. Sheridan testified that he never heard any engineer state that seatbacks were designed to yield rearward as a safety precaution. In September 1994, Mr. Sheridan told his supervisor that he was going to go to regulators with his concerns about the minivan seatbacks. In November 1994, the MSLT was disbanded at the direction of Ted Cunningham, the executive with authority over minivan operations. Mr. Sheridan was fired on December 27, 1994, and the minutes from the March 1993 MSLT meeting and the seat design specifications were confiscated from his office.[5]

We find little support in the record for Justice Koch's speculation that Mr. Sheridan's testimony "may very well reflect DaimlerChrysler's over-reaction to the Sixty Minutes story and the existence of some internal dissension regarding how best to respond to the concerns about car seat safety raised by the story." In fact, this characterization of Mr. Sheridan's testimony appears to have been rejected by the jury, which heard his testimony and was charged with resolving issues of credibility. Moreover, DCC presented no testimony that the formation of the MSLT was an "over-reaction," and it is clear from Mr. Sheridan's testimony that he believed the MSLT was necessary to address serious safety concerns. DCC's efforts to destroy the recommendations produced by the MSLT are a further indication of DCC's awareness of the seat-back problem and its determination to hide the problem rather than solve it. In our minds, this represents more than "some internal dissension regarding how best to respond to the concerns about car safety."

Justice Koch's efforts to discount Mr. Sheridan's testimony are inconsistent with our standard of review on appeal. The jury apparently accredited much of Mr. Sheridan's testimony, and, as we have stated, we are required to view his testimony in the light most favorable to the jury's verdict

---

[5] Those documents are not included in the record before us. The plaintiffs allege that the documents were not produced during discovery.

and assume the truth of his assertions that support the jury's verdict. Elec. Power Bd. of Chattanooga, 691 S.W.2d at 526. We therefore must assume that Mr. Sheridan was truthful when he denied leaking confidential information to Auto World magazine. We must also make the reasonable inference that Mr. Sheridan in fact was fired because he threatened to go to regulators with his safety concerns. In addition, whether Mr. Sheridan has been excluded from testifying in other cases is irrelevant to our review. The trial court denied DCC's motion to exclude Mr. Sheridan's testimony, and DCC has not appealed that aspect of the trial court's ruling. The actions of another court have no impact on our review of the testimony accredited by the jury.

The plaintiffs also sought to demonstrate that compliance with FMVSS 207 was insufficient to make the Caravan seats reasonably safe. A seat engineer employed by DCC testified that FMVSS 207 requires "inadequate seat strength to insure that the seat does not fail when the car is subject to severe rear impact." In addition, Mr. Sheridan testified that members of the MSLT agreed that compliance with FMVSS 207 was insufficient to ensure safety of consumers. Furthermore, both of DCC's experts on seat design agreed that compliance with FMVSS 207 alone is inadequate to protect passengers.

Finally, the plaintiffs argued that stronger seatbacks would not result in greater injuries to occupants of the seats. Specifically, the plaintiffs claimed that the Sebring seat, which was approximately five times stronger than the Caravan seat, was a reasonably safe seat. The results of Dr. Saczalski's crash testing provide some evidence that the Sebring seat offered a reasonable level of protection to its occupants. In addition, one of DCC's experts on seatback engineering agreed that the Sebring seat was a reasonably safe seat.

In summary, the jury's finding that the Caravan seats posed a substantial and unjustifiable risk to consumers was supported by: 1) expert testimony that the seats were defective and unreasonably dangerous; 2) crash tests demonstrating that the yielding seatbacks consistently encroached upon the occupant space behind them; 3) Mr. Sheridan's testimony that safety officials and engineers employed by DCC believed that the Caravan's seats were unacceptably dangerous; and 4) crash test evidence and expert testimony that Joshua Flax would not have been killed had a stronger seat been in place. The jury's finding that DCC consciously disregarded the risks posed by the Caravan seats was supported by: 1) minutes of DCC meetings noting that seats yielded; 2) DCC crash tests demonstrating that seats consistently encroached upon the passenger space behind them; 3) DCC records of injuries caused by yielding seatbacks; and 4) Mr. Sheridan's testimony that executives ignored the MSLT's warning that the seatbacks were unacceptably dangerous. We conclude that this evidence adequately supports the jury's conclusion that there is no serious or substantial doubt that DCC consciously disregarded a known, substantial, and unjustifiable risk to the plaintiffs. The evidence that DCC executives failed to heed the warnings of the MSLT and ordered the destruction of the committee's findings is particularly compelling. Not only did DCC fail to warn customers or redesign its product, DCC hid the evidence and continued to market the Caravan as a vehicle that put safety first. Because the jury's verdict is supported by clear and convincing material evidence, we must affirm the jury's finding of recklessness. Elec. Power Bd. of Chattanooga, 691 S.W.2d at 526.

DCC's argument that risks associated with the Caravan seats were justified by the need for the seat to absorb energy from the collision and protect seat occupants is of no avail. This argument was presented to the jury, and the jury was apparently unconvinced by it. The jury could have reasonably accredited Mr. Sheridan's testimony that the seats were not intentionally designed to yield as a safety mechanism. The jury also could have reasonably concluded from testimony regarding the Sebring seat that seats need not yield as dramatically as the Caravan seats to protect seat occupants. DCC's argument that there is an ongoing debate regarding the optimum level of seatback strength is also without merit. The jury could have reasonably concluded that such a debate exists and simultaneously found that the Caravan's seats were weak enough to fall outside the range of reasonable debate.

With regard to DCC's proposed justification, Justice Koch fails to give proper deference to the jury's conclusions. He concludes that a "genuine principled debate" concerning the proper seatback strength led DCC to design "the front seats of the minivan to yield in a controlled manner in the event of a rear impact." Whether the seats were designed to yield "in a controlled manner" was contested at trial. The jury, apparently convinced by the accident reconstruction, the expert testimony, DCC's crash tests, and Mr. Sheridan's testimony, concluded that the manner in which the seats yielded was unreasonably dangerous and that DCC recklessly disregarded the danger to its customers. While Justice Koch may disagree with that conclusion, this Court is not free to reweigh the evidence or second-guess the jury's conclusions when they are supported by material evidence.

We are also unconvinced by DCC's arguments that compliance with federal regulations and custom within an industry should bar the recovery of punitive damages. It is true that compliance with FMVSS 207 entitled DCC to a rebuttable presumption that its product was not unreasonably dangerous. Tenn. Code Ann. § 29-28-104. It is equally true, for the reasons stated above, that the evidence in this case thoroughly rebutted that presumption. Tennessee Code Annotated section 29-28-104 was designed "'to give refuge to the manufacturer who is operating in good faith and [in] compliance of what the law requires him to do.'" Tuggle v. Raymond Corp., 868 S.W.2d 621, 625 (Tenn. Ct. App. 1992) (alteration in original). The statute was not designed to provide immunity from punitive damages to a manufacturer who is aware that compliance with a regulation is insufficient to protect users of the product. While evidence of compliance with government regulations is certainly evidence that a manufacturer was not reckless, it is not dispositive. See O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1446 (10th Cir. 1987); Silkwood v. Kerr-McGee Corp., 769 F.2d 1451, 1457-58 (10th Cir. 1985); Dorsey v. Honda Motor Co., 655 F.2d 650, 656 (5th Cir. 1981). To hold otherwise would create an overly inflexible rule that would allow some manufacturers knowingly engaged in reprehensible conduct to escape the imposition of punitive damages.

Similarly, if a manufacturer knows that a common practice in an industry presents a substantial and unjustifiable risk to consumers, then compliance with the common practice is not an absolute bar to the recovery of punitive damages. Cf. Surles ex rel. Johnson v. Greyhound Lines, Inc., 474 F.3d 288, 300-01 (6th Cir. 2007) (applying Tennessee law and concluding that compliance with federal regulations and common industry practices is evidence of the standard of care but does

not conclusively establish the standard of care in negligence cases).  Evidence that a manufacturer consciously disregarded substantial and unjustifiable risks to the public can, in some rare cases, overcome evidence that the manufacturer's practice was common in the industry.  This is such a case.  Because the jury could have reasonably concluded from the evidence presented that DCC was aware that compliance with the FMVSS 207 and the industry standard for seat design was insufficient, we hold that punitive damages were not barred in this case.

### b. Due Process Concerns and the Excessiveness of the Punitive Damage Award

Having concluded that punitive damages were warranted in this case, we now review whether the size of the punitive damage award is excessive in violation of the due process standards announced by the United States Supreme Court in Gore and Campbell.  We begin our analysis of this issue by reviewing the United States Supreme Court's punitive damage jurisprudence.

In Gore, the United States Supreme Court was called upon to determine the constitutionality of a punitive damage award.  The Court concluded that due process requires that "a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  Gore, 517 U.S. at 574.  Accordingly, the Court adopted three guideposts for determining whether a defendant has adequate notice of the magnitude of the sanction that may be imposed.  The first and most important guidepost is the reprehensibility of the defendant's conduct.  Id. at 575.  The Court indicated that the presence of violence, deceit, reckless disregard for the safety of others, or repeated misconduct may be aggravating factors that increase the reprehensibility of the defendant's conduct.  Id. at 575-76.  The second guidepost is the ratio between the punitive damage award and the actual harm suffered by the plaintiff.  Id. at 580. Although the Court declined to adopt any strict mathematical formula, it repeated the suggestion from a previous case that "a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line'" of constitutional impropriety.  Id. at 581-82 (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991)).  The final guidepost requires courts to compare the punitive damage award to civil or criminal penalties that could be imposed for similar conduct.  "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue.'"  Id. at 583 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301 (1989) (O'Connor, J., concurring in part and dissenting in part)).  These legislative judgments are relevant because they provide defendants with notice of the severity of the penalty that may be imposed upon them.  See id. at 584.

The United States Supreme Court next considered the due process requirements for punitive damages in Campbell.  The Court again observed that the reprehensibility of the defendant's conduct is the most important guidepost.  Campbell, 538 U.S. at 419.  In an effort to provide guidance to lower courts, the Court stated that courts should determine reprehensibility

> by considering whether:  the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or

safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id. The Court further stated, "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." Id. With regard to the second guidepost, the Court stated, "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425. In addition, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. The Court then qualified its previous statement by observing that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." Id. Finally, when discussing the third guidepost, the Court held that

> [t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award. Id. at 428.

Unlike the deferential standard of review employed when reviewing a jury's factual conclusions, we conduct a de novo review of the amount of a punitive damages award to determine whether the award meets due process requirements in light of the three guideposts. Id. at 418.

Having reviewed the applicable United States Supreme Court precedents, we now turn to the application of the principles set forth therein. The evidence in this case clearly demonstrates that DCC's conduct was reprehensible. Obviously, the harm suffered in this case was physical rather than economic. The death of a child is undoubtedly a tragic experience that is far more serious than a mere economic loss. Furthermore, as we have summarized above, DCC's conduct evinces a conscious disregard for the safety of others. In addition, DCC deceitfully covered up evidence of the deficiencies of its seat design while simultaneously advertising the Caravan as a vehicle that put children's safety first. Finally, DCC's wrongdoing was not an isolated incident because DCC had knowledge of the danger its seats posed to the public for years and yet continued to sell its vehicles in an unreasonably dangerous condition throughout the State of Tennessee. We therefore conclude that under this first, most important guidepost DCC had fair notice that its conduct could subject it to a severe penalty.

We now turn to the second guidepost, the ratio between the punitive damages and compensatory damages. The trial court in this case remitted the punitive damages for the wrongful

-15-

death of Joshua Flax to $13,367,345.[6] We must compare this punitive damage award to the $2,500,000 in compensatory damages for which DCC is liable for the wrongful death of Joshua Flax. The ratio between these two awards is 1 to 5.35. This ratio is not clearly impermissible because it does not exceed a single digit ratio. See Campbell, 538 U.S. at 425. There is, however, some doubt as to the propriety of a ratio of 1 to 5.35 because the United States Supreme Court has suggested that a ratio of more than 1 to 4 approaches the outer limits of constitutionality. Id.; Gore, 517 U.S. at 581. The Court has also suggested that a ratio of 1 to 1 may be all that is permissible in cases where compensatory damages are "substantial." See Campbell, 538 U.S. at 425. None of these ratios, however, present "rigid benchmarks," and the United States Supreme Court has thus far declined to adopt any fixed mathematical formula to determine the appropriateness of punitive damages. Id. Instead, the Court has held that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." Id.

In light of the first two guideposts, we believe that a ratio of 1 to 5.35 would be warranted in this case. Although the United State Supreme Court has made no effort to demonstrate when damages are "substantial," we do not believe that an award of $2,500,000 is so large as to require a ratio of 1 to 1. Furthermore, a punitive damage award of $13,367,345 is consistent with the concept that the reprehensibility of a defendant's conduct is the most important of the due process guideposts and is justified by DCC's long-term pattern of conduct that resulted in severe injuries to the plaintiffs and showed a conscious disregard for the safety of Tennessee citizens. Accordingly, in light of the first two guideposts we would hold that a punitive damage award approaching the maximum ratio permitted by the due process clause is appropriate.

The third guidepost set forth in Gore seems to compel a dramatically different conclusion. The statute that most closely expresses the Tennessee General Assembly's judgment concerning the wrongfulness of DCC's conduct is the reckless homicide statute codified at Tennessee Code Annotated section 39-13-215 (2006). According to that statute, reckless homicide is "a reckless killing of another." Tenn. Code Ann. § 39-13-215. The meaning of the word "reckless" as it is used in that statute is identical to the meaning of "reckless" in a punitive damage context. Compare Hodges, 833 S.W.2d at 901, with Tenn. Code Ann. § 39-11-302(c) (2006). Because DCC's reckless conduct resulted in the death of Joshua Flax, reckless homicide is the criminal act most analogous to DCC's conduct.[7] The maximum statutory punishment for corporations that commit reckless homicide is a fine of $125,000. Tenn. Code Ann. § 40-35-111(c)(4) (2006).

Pursuant to the holding of the United States Supreme Court, we must accord "substantial deference" to the General Assembly's decision that $125,000 is an appropriate sanction against corporations guilty of reckless homicide. Gore, 517 U.S. at 583. Furthermore, we must "avoid use

---

[6] Having invalidated the trial court's award of compensatory and punitive damages based on NIED, we need only discuss the punitive damages arising out of the wrongful death claim.

[7] We express no opinion concerning whether DCC could actually be prosecuted for reckless homicide under Tennessee Code Annotated section 39-11-404 (2006). It is sufficient that the statutory definition of reckless homicide encompasses the conduct of DCC.

-16-

of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed." Campbell, 538 U.S. at 428. Although the United States Supreme Court has never held that the third guidepost is dispositive, it appears that under this guidepost $125,000 would be the maximum punitive damage award that could be imposed in this case. Arguably, this is because DCC never had notice that it could be held liable for an amount greater than $125,000.[8] Clearly, the result recommended by the third guidepost is dramatically at odds with the result suggested by the first two. We are unfortunately left with little guidance as to how to resolve this discrepancy because both Gore and Campbell are cases in which all of the guideposts suggest the same result. Other courts have experienced similar frustrations when attempting to apply the third guidepost, and some have chosen to ignore the third guidepost altogether. See, e.g., In re Exxon Valdez, 490 F.3d 1066, 1094 (9th 2007) (noting that if the Court of Appeals for the Ninth Circuit mentions the third guidepost at all, it does not review the amounts of legislative penalties but determines "whether or not the misconduct was dealt with seriously under state civil or criminal laws"); Willow Inn, Inc. v Pub. Serv. Mut. Ins. Co., 399 F.3d 224, 237-38 (3d Cir. 2005) (noting the difficulty courts have in applying the third guidepost and declining to overturn a punitive damage award on that basis alone).

Although we are somewhat unsure how to reconcile the third guidepost with the first two, we are inclined to give the first two guideposts considerably more weight. The Unites States Supreme Court has held that the first guidepost is the most important and has never stated that the third guidepost is dispositive. Furthermore, we are unaware of any state or federal case that has invalidated a punitive damage award solely because the award was greater than that contemplated by statutory penalties. In addition, the trial court's award in this case is far less drastic than the awards rejected in Gore and Campbell, which were 1,000 and 14,500 times greater, respectively, than the maximum civil or criminal penalty. See Campbell, 538 U.S. at 428; Gore, 517 U.S. at 584. Finally, we do not believe that a punitive damage award of $125,000 would adequately punish DCC or deter future instances of similar conduct. For these reasons, we conclude that a punitive damage award of $13,367,345 is constitutionally permissible in this case.

### c. Due Process Concerns and Harm to Non-Parties

DCC also contends that its right to due process was violated because the jury was allowed to punish DCC for harm suffered by persons who were not parties to the action. In support of this argument, DCC cites the United States Supreme Court's recent decision, Philip Morris. In Philip Morris, the Court held that trial courts must, upon request, provide assurance that juries are not

---

[8] We find this reasoning somewhat peculiar considering that our decision in Hodges clearly set forth both the conditions under which a defendant could be held liable for punitive damages and the factors that would determine the amount of punitive damages available. See Hodges, 833 S.W.2d at 901-02. Although those standards were necessarily imprecise, our decision in that case would appear to be sufficient to provide DCC with notice that consciously disregarding the safety of Tennessee citizens could subject it to a considerably large punitive damage award.

allowed to punish defendants for harm caused to nonparties. Id. at 1065.[9] In the present case, DCC requested that the jury be instructed that it could not punish DCC for harm suffered by nonparties, but the trial court declined to give this instruction. Unfortunately, DCC did not question the rejection of its proposed jury instruction in the Court of Appeals. DCC now seeks to resurrect this issue before this Court. Litigants who hope to have an issue heard by this Court must first present that issue to the intermediate appellate court. See Brown v. Crown Equip. Corp., 181 S.W.3d 268, 281 n.5 (Tenn. 2005); Va. & Sw. R.R. Co. v. Sutherland, 197 S.W. 863, 864 (Tenn. 1917). Accordingly, we do not reach the issue of whether the trial court erred by failing to instruct the jury not to punish DCC for harm suffered by nonparties.

### IV. Validity of Plaintiffs' Post-Sale Failure to Warn Claim

In their complaint, the plaintiffs asserted a claim based on DCC's failure to warn consumers that the Caravan's seatbacks posed a danger to children placed behind them. Prior to trial, the plaintiffs filed a trial brief clarifying that they were attempting to bring two separate failure to warn claims. The first claim is a traditional failure to warn claim alleging that DCC failed to provide a warning prior to or at the time the Caravan was sold. Tennessee courts have long held that a manufacturer may be held strictly liable for failing to warn consumers of the dangers of a particular product at the time of sale. Whitehead v. Dycho Co., 775 S.W.2d 593, 596 (Tenn. 1989); Trimble v. Irwin, 441 S.W.2d 818, 821 (Tenn. Ct. App. 1968). The General Assembly has also acknowledged that a failure to warn claim is a valid basis for a product liability action. Tenn. Code Ann. § 29-28-102(6) (2000). Accordingly, the trial court permitted the plaintiffs to proceed with the traditional failure to warn claim, and DCC has not appealed the trial court's ruling on that issue.

The plaintiffs' second failure to warn claim is more problematic. In their trial brief, the plaintiffs asserted that DCC should also be held liable for failing to warn the plaintiffs of the condition of the seatbacks after the Caravan was sold. Plaintiffs argued their second claim is what is commonly referred to as a "post-sale failure to warn" claim,[10] a claim that has not been previously recognized in Tennessee. Irion v. Sun Lighting, Inc., No. M2002-00766-COA-R3-CV, 2004 WL 746823, at *17 (Tenn. Ct. App. Apr. 7, 2004). Under the assumption that their second claim was a post-sale failure to warn claim, the plaintiffs argued that the trial court should join the jurisdictions that recognize the post-sale failure to warn claims and adopt the post-sale failure to warn provisions of the Restatement (Third) of Torts. See Restatement (Third) of Torts: Products Liability § 10 (1998). The trial court was persuaded by the plaintiffs' arguments and allowed the plaintiffs to

---

[9] The Court did attempt to clarify that injuries suffered by nonparties are relevant to demonstrate the reprehensibility of a defendant's conduct. Id. at 1064. As the Court stated, "conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few." Id. at 1065. Upon motion by the parties, trial courts are required to instruct the jury that it may consider harm to nonparties to determine reprehensibility but should not directly punish defendants for harm to nonparties.

[10] For reasons that are explained below, we do not believe plaintiffs' second failure to warn claim is properly characterized as a post-sale failure to warn claim. Accordingly, we refer to their cause of action as the "second failure to warn claim" or the "second claim."

present evidence and argument at trial in support of their second failure to warn claim. At the conclusion of the trial, the jury found the defendants liable on the plaintiffs' second failure to warn claim.

DCC contends that the trial court erred in recognizing the post-sale failure to warn claim. We agree. Although different states apply the doctrine differently, the vast majority of courts recognizing post-sale failure to warn claims agree that a claim arises when the manufacturer or seller becomes aware that a product is defective or unreasonably dangerous after the point of sale and fails to take reasonable steps to warn consumers who purchased the product. See, e.g., Lovick v. Wil-Rich, 588 N.W.2d 688, 693 (Iowa 1999); Patton v. Hutchinson Wil-Rich Mfg. Co., 861 P.2d 1299, 1313 (Kan. 1993); Owens-Illinois, Inc. v. Zenobia, 601 A.2d 633, 645-46 (Md. 1992); Comstock v. Gen. Motors Corp., 99 N.W.2d 627, 634 (Mich. 1959); see also Douglas R. Richmond, Expanding Products Liability: Manufacturers' Post-Sale Duties to Warn, Retrofit and Recall, 36 Idaho L. Rev. 7, 18 (1999). Accordingly, courts apply the traditional failure to warn claim when a manufacturer or seller had knowledge of a defect at the time of sale and apply the post-sale failure to warn claim when a manufacturer or seller learns of the defect after the time of sale.[11] Victor E. Schwartz, The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine, 58 N.Y.U. L. Rev. 892, 893 (1983).

Unlike plaintiffs in post-sale duty to warn cases, the plaintiffs in this case do not allege that DCC discovered problems with the seatbacks after the time of sale. On the contrary, the theory of the plaintiffs' case was that DCC had knowledge that the seats were defective and unreasonably dangerous as early as the 1980s. Furthermore, DCC does not deny that it had knowledge of the performance of its seats at the time of sale but argues that the seats functioned in a non-defective and reasonably safe manner. There is therefore no dispute regarding DCC's knowledge at the time of sale of the Caravan. Although the plaintiffs allege that DCC continued to receive notice that its product was dangerous after the sale, they do not allege that DCC received any new information during this period. Accordingly, this case does not present the facts necessary to allow us to consider the merits of recognizing post-sale failure to warn claims. Rather, the plaintiffs' allegation that DCC was negligent in failing to warn the plaintiffs after the sale is an attempt to impose liability a second time for what is essentially the same wrongful conduct. If a defendant negligently fails to warn at the time of sale, that defendant does not breach any new duty to the plaintiff by failing to provide a warning the day after the sale. Instead, the defendant merely remains in breach of its initial duty. For these reasons, we conclude that the trial court erred by adopting and applying the post-sale failure to warn claim in this case. We express no opinion, however, as to the merits of recognizing that cause of action in an appropriate case.

---

[11] The distinction between the two causes of action is important because the burden of issuing a warning is much greater once the product has left the control of the manufacturer or seller. Restatement (Third) of Torts: Products Liability § 10 cmt. a. Therefore, jurisdictions that allow post-sale failure to warn claims generally consider the difficulty of identifying and communicating with product users when determining whether the manufacturer or seller acted reasonably. See id.; Lovick, 588 N.W.2d at 695-96. These difficulties are generally not an issue in traditional failure to warn claims.

DCC claims the trial court's error was prejudicial to DCC in two ways. First, DCC claims that due process concerns are raised by allowing the jury to base its recklessness determination on a previously unrecognized cause of action. Essentially, DCC argues that it did not have notice that it could be punished for failing to issue a warning after the date of sale. See Gore, 517 U.S. at 574 (holding that a defendant is entitled to fair notice of "the conduct that will subject him to punishment"). Although the jury did find DCC liable for the post-sale duty to warn claim, it also found DCC liable on three other grounds—designing, manufacturing, and selling the Caravan with defective seats; designing, manufacturing, and selling the Caravan with unreasonably dangerous seats; and failing to warn the plaintiffs at the time of sale. There was sufficient evidence of recklessness related to these three claims from which a reasonable jury could have determined that punitive damages were warranted. Furthermore, in the second phase of the trial, the trial court instructed the jury that it was not to base its award of punitive damages on the post-sale failure to warn claim. In spite of this instruction, the jury awarded $98,000,000 in punitive damages. The jury's belief that the three valid claims warranted such a substantial award is powerful evidence that the decision to impose punitive damages was not based upon the post-sale failure to warn claim. Furthermore, we are similarly unconvinced that the jury based the wrongful death award on the post-sale failure to warn claim. Under the circumstances of this case, the three valid claims were sufficient to support a wrongful death award of $5,000,000. Accordingly, we find this argument to be without merit.

Second, DCC claims that the post-sale duty to warn claim permitted the admission of evidence that otherwise would have been deemed irrelevant. Specifically, DCC argues that the evidence of other similar incidents occurring after the date of sale would not have been admissible. Indeed, the plaintiffs acknowledged at trial and in their response to DCC's Motion for Judgment Notwithstanding the Verdict and New Trial that the other similar incidents were tendered and admitted only to prove that DCC had notice of the condition of the seats. The jury was also instructed that it could consider the other similar incidents only for the purpose of showing that DCC had notice of the seat's condition. In their post-trial motions and responses, the parties appeared to agree that the documents supporting the other similar incidents would have been inadmissible hearsay if offered to prove that the seats were defective or unreasonably dangerous. Clearly incidents that occurred after the date the plaintiffs purchased the Caravan could not have provided DCC with notice that it should provide a warning at the time the Caravan was sold. It therefore appears that the trial court admitted evidence of the post-sale similar incidents to show notice with respect to the plaintiffs' second failure to warn claim. We agree that there would have been no valid reason to admit the post-sale similar incidents if the trial court had not recognized the plaintiffs' second failure to warn claim. Because we hold that the trial court should not have recognized this claim, the trial court erred in admitting evidence of the twenty-five other similar incidents that occurred after the Caravan was purchased in May 1998.

Our inquiry does not end here. DCC is entitled to reversal of the jury's verdict only if the trial court's error would have "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); accord Cumulus Broad., Inc. v. Shim, 226 S.W.3d 366, 375 (Tenn. 2007). "The greater the amount of evidence of guilt, the heavier the burden

on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." State v. Rodriguez, ___ S.W.3d ___, ___ (Tenn. 2008).

Although the jury heard evidence of twenty-five post-sale similar incidents, the trial court instructed the jury that it could consider that evidence only for the purpose of determining whether DCC had notice of the condition of the seats. We presume that the jury followed the trial court's instruction and did not consider the other similar incidents for purposes of determining whether the seats were unreasonably dangerous. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). We therefore conclude that the trial court's instruction significantly reduced the danger of prejudice to DCC. In addition, the trial judge's remittitur of the punitive damages award also limited the danger that the evidentiary error affected the judgment in this case.

Most importantly, there was a wealth of evidence supporting the jury's verdict. There was testimony that DCC had received notice of children injured by yielding seatbacks as early as the mid-1980s. DCC's own crash test videos demonstrated that seatbacks consistently yielded into the passenger space behind them in rear-end collisions. Mr. Sheridan testified that the MSLT informed DCC executives that the seats were dangerous. Finally, the plaintiffs introduced twelve similar incidents that occurred before the date of sale. Of those twelve, three incidents involved a child suffering skull or facial fractures as a result of a yielding seat. Three others involved children suffering other injuries from yielding seatbacks. The jury's verdict is amply supported by this properly admitted evidence. In light of the wealth of evidence supporting the jury's verdict, we conclude that the twenty-five other similar incidents that were improperly admitted were not so significant as to affect the jury's verdict. Accordingly, we conclude that the trial court's decision to admit the post-sale other similar incidents did not prejudice the judicial process or more probably than not affect the judgment.

We are not indifferent to Justice Koch's concerns about the volume of improperly admitted evidence and the potential for prejudice when admitting other similar incidents. As we have stated, however, the proof of DCC's recklessness is so powerful that the jury was probably not affected by the trial court's error. Justice Koch has a very different view of the evidence in this case, and it is therefore unsurprising that his dissent expresses a greater estimation of the impact of the trial court's error.

## V. Miscellaneous Rulings of the Trial Court

DCC also argues that it was prejudiced by various other rulings of the trial court. Specifically, DCC argues that the trial court abused its discretion by admitting the other similar incidents that occurred prior to the sale of the Caravan, excluding accident data proffered by DCC, and failing to grant a new trial as a sanction for the trial court's determination that plaintiffs abused the discovery process. DCC also argues that the absence of a valid ad damnum clause in plaintiffs' complaint should bar any award to the plaintiffs. For the reasons stated by the Court of Appeals, we conclude that each of these arguments is without merit.

## VI. Conclusion

We hold that Ms. Sparkman's NIED claim is a "stand-alone" claim in spite of the fact that she simultaneously brought a wrongful death claim. Therefore, Ms. Sparkman's NIED claim should have been supported by expert medical or scientific proof of a severe emotional injury. Accordingly, we affirm the Court of Appeals' reversal of the compensatory and punitive damage awards based on Ms. Sparkman's NIED claim. In addition, we conclude that the punitive damages awarded by the trial court were adequately supported by the evidence and were not excessive. Therefore, we reverse the Court of Appeals' decision to overturn the punitive damage award related to the plaintiffs' wrongful death claim. Finally, we hold that the trial court erred by recognizing the plaintiffs' second failure to warn claim but conclude that the error did not more probably than not affect the judgment or prejudice the judicial process. Costs of this appeal are taxed equally to the appellee, DaimlerChrysler Corporation, and the appellants, Jeremy Flax and Rachel Sparkman, and their sureties for which execution may issue if necessary.

 

 

_____

JANICE M. HOLDER, JUSTICE