
FILED

April 20, 2018

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 9:00 A.M.



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Jared Kizer ) | Docket No. 2017-07-0073 |
| ) | |
| v. ) | State File No. 81955-2016 |
| ) | |
| Express Services, Inc., et al. ) | |
| ) | |
| ) | |
| Appeal from the Court of Workers' ) | |
| Compensation Claims ) | |
| Allen Phillips, Judge ) | |

---

### Reversed and Remanded—Filed April 20, 2018

---

In this interlocutory appeal, the employee suffered amputation of three fingers on his right hand when his hand became caught in a machine he was operating. The employer denied the claim based on the employee's positive post-accident drug test results and its status as a participant in Tennessee's Drug-Free Workplace Program. Following an expedited hearing, the trial court concluded the employee had rebutted the presumption that his drug use was the proximate cause of his injury by clear and convincing evidence, as provided by Tennessee Code Annotated section 50-6-110(c) (2017). The employer has appealed. Having carefully reviewed the record, we reverse the trial court's decision and remand the case.

Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, joined. Judge David F. Hensley filed a dissenting opinion.

Gregory Fuller, Brentwood, Tennessee, for the employer-appellant, Express Services, Inc.

Spencer R. Barnes, Jackson, Tennessee, for the employee-appellee, Jared Kizer

### Factual and Procedural Background

Jared Kizer ("Employee"), a resident of Henderson County, Tennessee, was employed by Express Services, Inc. ("Employer"), a temporary employment agency. Employee was assigned to work at Pinnacle Foods ("Pinnacle"), a frozen foods processing plant, where he worked for approximately seven months. On October 20,

2016, Employee was operating a "splitter" machine, which cut blocks of frozen fish into fish sticks. Employee's shift began at 4:00 p.m. At approximately 9:00 or 9:15 p.m., the splitter he was operating became jammed. He testified he pushed the "e-stop" button to turn the machine off and then lifted a hood that was designed to disengage the machine.[1] He testified he lifted the hood all the way up, which was the only position that would disengage the machine, and used both hands to unclog the machine. There is some dispute regarding whether he lifted the hood completely, which would cause it to catch and remain open, or whether he was holding the hood partially raised with his left hand while using his right hand to remove the clog. Regardless, while Employee's right hand was in the machine, it engaged and traumatically amputated Employee's right index finger, long finger, and ring finger, and caused injury to his right small finger.[2]

Employee was transported to the hospital, where he underwent emergency treatment for his injury. In the course of his treatment, he submitted to a urine drug screen. The drug test was positive for morphine, which he had been given in the emergency room, and for THC, a metabolite of marijuana.

It is undisputed that Employer is a participant of Tennessee's Drug-Free Workplace Program ("DFWP") and that Employee's drug screen was positive for THC well beyond the prohibited level. Accordingly, Employer denied the claim in its entirety based on Tennessee Code Annotated section 50-6-110(c)(1), which provides "[i]n cases where the employer has implemented a drug-free workplace pursuant to chapter 9 of this title, if the injured employee has, at the time of the injury . . . a positive confirmation of a drug . . ., then it is presumed that the drug . . . was the proximate cause of the injury." The parties agree that this presumption applies in this case and that the burden of proof shifted to Employee to rebut the presumption "by clear and convincing evidence that the drug . . . was not the proximate cause of the injury." *Id.*

In preparation for the expedited hearing, the parties took the depositions of Dr. Kenneth Ferslew, a toxicologist; Dr. Michael Dolan, Employee's treating physician; and Dr. Mario Figueroa, the emergency room physician who treated Employee. Dr. Ferslew testified regarding the presence of THC in Employee's urine drug screen and the effects of marijuana on users of the drug. Specifically, Dr. Ferslew stated that "the presence of [THC] in [Employee's] urine only confirms his prior use of [marijuana] and excretion of an inactive metabolite. It does not prove he was under the influence . . . at the time of the injury." Moreover, "[o]ther forensic evidence would be needed to prove when he used marijuana and the period of pharmacodynamic effect. This result is consistent with [Employee's] admission of prior smoking of marijuana a day or two prior to the injury."

---

[1] In various parts of the record, this mechanism was described as a "door," a "hood," and a "guard."

[2] There is no dispute that the injury occurred as generally described by Employee or that the injury necessitated extensive medical care. Thus, we do not discuss the course of Employee's medical treatment beyond what is necessary to address the issues raised in this appeal.

When questioned regarding whether the toxicology screening would indicate Employee was intoxicated or impaired, Dr. Ferslew responded "[i]t can't prove he was, it can't prove he wasn't."

The parties also questioned the emergency room physician, Dr. Figueroa, about whether Employee appeared to be impaired upon his arrival at the emergency room. Dr. Figueroa stated he did not observe any outward signs of intoxication. He further explained that Employee denied using illegal drugs and, after receiving that response, Dr. Figueroa did not pursue the issue any further.

Employee admitted he was a habitual marijuana smoker. His testimony regarding how often he used marijuana was inconsistent, but he generally testified he smoked marijuana every other day in the morning before going to a job on a family friend's farm. He denied smoking before beginning his shifts at Pinnacle, which started at 4:00 p.m. He initially denied smoking on the day of the accident, although he testified at the expedited hearing that he had smoked a joint the morning of his injury. He was unable to testify with any certainty regarding how much he smoked, and his testimony was inconsistent with respect to whether he smoked only in the mornings and whether he ever smoked two days in a row. He testified he believed his marijuana usage affected his memory.

Phillip Miller, the lead maintenance technician for Pinnacle, testified at the expedited hearing. He was also trained as an emergency medical technician and was the first person to assist Employee after the accident. He testified Employee did not appear intoxicated after the accident, but acknowledged he was not trained to identify signs of marijuana intoxication in habitual users. With respect to the functioning of Employee's machine, Mr. Miller testified as follows:

> Q: As lead maintenance technician, did you do anything with this machine once [Employee] was offsite and headed to get medical attention?
>
> A: Yes, sir.
>
> Q: Tell the Court what you did, please.
>
> A: Upon the incident, the manager, which was plant manager at the time, my boss, after [Employee] . . . left, we had to verify that all safety devices were working on this equipment, such as interlocking devices and E-stop.
>
> Q: Okay. Were they working?
>
> A: Yes, sir.

During cross-examination, he elaborated on this point:

Q:    Okay.  And based on your inspection, you found that when you hit that E-Stop, that first line of defense in shutting this machine off, that that E-Stop worked?

A:    That's correct.

Q:    Okay.  So if somebody hit that E-Stop, that machine would have shut off; is that correct?

A:    That's correct.

 . . . .

Q:    Tell me how, based upon your investigation, your review of these working parts of this machinery, how this machine – how this accident had to have occurred?

A:    Okay.  Well, when I first approached the machine to inspect, the first thing was we checked the E-Stop.  Killed – hit the E-Stop and killed the machine and pulled the E-Stop.  Started it back up.  And the next thing we was [sic] checking was the interlock switch on the hood.  We found that you could actually – due to the distance, which were [sic] the hood and the main contact with the secondary device on – to kill the complete interlock, you could actually hold the hood in between point and reach in.  And by holding it in between, the machine still would cycle.

The trial court accepted into evidence, over Employer's objections, a report produced by the Tennessee Occupational Safety and Health Administration ("TOSHA"). With respect to the injury suffered by Employee, the TOSHA investigator concluded Pinnacle had committed a "[s]erious" violation, finding that "[m]achine guarding was not provided to protect operator(s) and other employees from hazard(s) created by moving parts."  Specifically, with respect to the machine on which Employee was injured, the investigator determined that "the method of guarding on the filler box of Splitter #2 in the Fish Processing Area was not adequate.  The limit switch on the filler box top was not functioning, therefore allowing the pusher to cycle while the top was open; exposing the employees to injury."

Following the expedited hearing and the trial court's consideration of the TOSHA report, the trial court concluded Employee had met his burden of rebutting, by clear and convincing evidence, the presumption that his intoxication was the proximate cause of his injury.  In reaching that conclusion, the court observed "[t]here is no serious or

4

substantial doubt that the machine should not have engaged when it did, irrespective of [Employee's] earlier marijuana usage." The court additionally stated that, although Employee's testimony "was imperfect, . . . the only evidence in the record is that he did not appear impaired on the night of the injury. Moreover, the expert toxicology proof here does not establish THC caused [Employee's] accident." Employer has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2017). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2017).

## Analysis

When an employer has qualified as a certified drug-free workplace, Tennessee's Workers' Compensation Law provides a rebuttable presumption that, in circumstances where an injured worker tests positive for alcohol or certain drugs as the result of a properly conducted post-accident drug screening, the employee's use of alcohol or drug(s) was the proximate cause of the injury. Tenn. Code Ann. § 50-6-110(c)(1). To rebut such a presumption, the employee has the burden of proving, by clear and convincing evidence, that his or her drug or alcohol use was not the proximate cause of the injury. *Id.* The Tennessee Supreme Court has explained that, to establish clear and convincing evidence, the party with the burden must show "there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Mansell v. Bridgestone Firestone N. Am., Inc.*, 417 S.W.3d 393, 411 (Tenn. 2013) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

In the present case, the parties stipulated, or the evidence was uncontradicted, that Employer was a certified drug-free workplace and that Employee used an illegal drug on the day of the accident. It is further uncontradicted that the toxicology screening revealed

a metabolite of THC at a level "above the cutoff," indicating a "positive result." Employee admitted he was a habitual user of marijuana and had smoked the morning of the accident. Therefore, Employer was entitled to a presumption that Employee's drug use was the proximate cause of his injury.

It was then Employee's burden to prove, by clear and convincing evidence, that his drug use was not the proximate cause of his injury. However, to consider this case in its proper context, we must also consider the burden of proof applicable to expedited hearings. As we have noted numerous times, at an expedited hearing, an employee need not prove every element of his or her claim by a preponderance of the evidence, but must come forward with sufficient proof to convince the trial court he or she is likely to prevail at trial in satisfying the ultimate burden of proof with respect to every essential element of the claim. *See, e.g.*, *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *8 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Therefore, under the circumstances presented in this case, Employee had the burden of coming forward with sufficient evidence at the expedited hearing to convince the trial court he would likely prevail at trial in rebutting the presumption of proximate causation by clear and convincing evidence. We disagree with the trial court that Employee met this burden.

*Admissibility of TOSHA Report*

During the expedited hearing, Employee offered into evidence a report generated by a TOSHA investigator. Employer objected to the admissibility of this report on numerous grounds. First, it argued the report was hearsay. Second, it argued even if the report constituted a "public record" and fell under a hearsay exception pursuant to Rule 803(8) of the Tennessee Rules of Evidence, it lacked sufficient trustworthiness to render it admissible. Third, it argued the report contained irrelevant information concerning alleged incidents other than the incident at issue in this case. Fourth, it argued Employer had no opportunity to "participate in this investigation, present evidence, cross-examination, or discuss anything." Finally, it argued the report is "far more prejudicial than it is probative."

In discussing the admissibility of this report with counsel for Employee, the trial court asked, "[d]oes it have any bearing on the drug-free workplace and the causation of the injury in any way, in your opinion?" Employee's counsel responded, "I don't believe that it does." The trial court nonetheless concluded the report was admissible under Rule 803(8) (the public records hearsay exception) and Rule 901(b)(7) (authentication of public records).

In concluding Employee had overcome the presumption that Employee's drug use was the proximate cause of his injury by clear and convincing evidence, the trial court relied, in part, on the TOSHA investigation. Specifically, the court cited the TOSHA

report in concluding one or more of the machine's safety devices malfunctioned. The court then concluded, "[t]here is no serious or substantial doubt that the machine should not have engaged when it did, irrespective of [Employee's] earlier marijuana usage." Thus, the trial court reviewed and relied, at least in part, on the TOSHA report to address the cause of this accident.

The nature of the information in the TOSHA report upon which the trial court partially relied reasonably can be characterized as expert opinion. Rule 702 of the Tennessee Rules of Evidence allows expert testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education." Tenn. R. Evid. 702.[3] Although we have found no cases in which a Tennessee appellate court has considered the admissibility of a TOSHA report as expert proof, courts in other jurisdictions have considered similar issues. For example, the Eleventh Circuit Court of Appeals concluded that only factual findings from an OSHA report were admissible, but "legal conclusions" were not. *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir. 1989). Similarly, a Pennsylvania court concluded "if a record is in the nature of an expert opinion . . ., the record's conclusions or impressions are not admissible as a business record unless the person who rendered the opinion is available for cross-examination." *Labor Ready Ne., Inc. v. Workers' Comp. Appeal Bd.*, No. 486 C.D. 2017, 2018 Pa. Commw. Unpub. LEXIS 107, at *27 (Commw. Ct. of Pa. Feb. 22, 2018). *See also Danzy v. Tri-Lift, Inc.*, No. NNHCV106008373S, 2012 Conn. Super. LEXIS 1471, at *3 n.4 (Conn. Sup. Ct., June 5, 2012) (OSHA report deemed inadmissible because proponent failed to establish proper foundation).

In the present case, the TOSHA investigator reached a technical conclusion as to the apparent malfunction of the hood lift and the ultimate cause of the injury, and the trial court noted these conclusions in addressing the cause of Employee's injury. However, Employee, as the proponent of the TOSHA report, did not establish the "knowledge, skill, experience, training, or education" of the report's author, as required by Rule 702. He also did not distinguish between factual information and expert conclusions in the report. The report was not accompanied by an affidavit.[4] Finally, Employee did not depose the author of the report or subpoena the investigator to the hearing, such that the investigator would be subject to cross-examination.

---

[3] In his dissent, our colleague argues that Employer did not cite Rule 702 in its objections to the admissibility of the TOSHA report and, therefore, we should not consider Rule 702 in our analysis of the admissibility issue. We conclude, however, that Employer's general objections to admissibility, including its objections that it had no opportunity to participate in the TOSHA investigation or engage in cross-examination following issuance of the report, provide a basis for our analysis.

[4] Such an affidavit likely would have been admissible at an expedited hearing pursuant to Tenn. Comp. R. & Regs. 0800-02-21-.14 (2016).

In short, we conclude Employee failed to lay a proper foundation for the introduction of expert conclusions contained in the TOSHA report. To the extent the trial court relied on such expert conclusions to determine the proximate cause of Employee's injury, this was error. However, because the trial court couched its reliance on the TOSHA report as cumulative of other evidence, we conclude any such error was harmless under the circumstances presented in this case.

*Expert Medical Testimony*

The trial court acknowledged the equivocal nature of the expert medical testimony offered at the expedited hearing. The emergency room physician, Dr. Mario Figueroa, testified he saw no obvious signs of intoxication, but also admitted he could not state whether Employee was impaired "in another way." The toxicologist, Dr. Kenneth Ferslew, explained that the urinalysis only "confirms his prior use" of the drug. He further acknowledged these test results could not prove or disprove whether Employee was under the influence of the drug at the time of the accident. Instead, "[o]ther forensic evidence would be needed to prove when he used marijuana and the period of pharmacodynamic effect." He testified that, based on his research, marijuana can impair "the subject's ability to do critical thinking in a dose-dependent manner. The higher the dose, the more the impairment. . . . The higher the dose, the greater degree of incoordination that occurred in these [study participants]."

In addition, Dr. Ferslew commented that current medical literature suggests the effects of marijuana usage typically last "for a period of two . . . maybe up to six hours after use." He noted, however, that chronic use of marijuana can cause "long-term impairment," including "slowing of thought," "altered judgment," "delayed reaction," "altered consciousness," and "lack of eye-hand coordination." Finally, Dr. Ferslew explained chronic, long-term marijuana usage could "affect [the person's] ability to operate machinery in an effective manner" and could "affect memory." Employee admitted he was a habitual user of marijuana and testified at the hearing he believed his marijuana usage affected his memory.

Thus, we conclude the expert medical proof did not weigh in favor of Employee in establishing a likelihood of proving, by clear and convincing evidence, that his drug use was not the proximate cause of his injury. As a result, we cannot agree Employee satisfied his burden at the expedited hearing of coming forward with sufficient evidence indicating he would likely prevail on this issue at trial.

*Proximate Cause of Injury*

In evaluating proximate cause, the trial court acknowledged Employee's burden and commented Employee "must produce facts that create no serious or substantial doubt that his drug use did not cause his injury and that it is highly probable it did not."

8

Thereafter, the trial court noted the machine was equipped with two primary safety mechanisms pertinent to this case, the "e-stop" and the hood lift, either of which should have shut down or otherwise disengaged the machine. The trial court acknowledged conflicting testimony regarding whether Employee engaged the e-stop prior to lifting the hood and reaching his hand in. Employee testified he engaged the e-stop, but Mr. Miller, who examined the machine soon after the accident, testified he found the e-stop had not been engaged and further found the e-stop was functioning properly after the accident.

Even assuming the hood lift malfunctioned and did not disengage the machine as it was designed to do, we find no explanation in this record regarding whether Employee hit the e-stop before approaching the hood lift, whether the e-stop failed to properly shut down the machine if Employee pushed it, whether Employee forgot or elected not to hit the e-stop, and/or whether Employee's drug use had any causal connection to the use or non-use of the e-stop. The posture of this case at the expedited hearing requires us to presume his drug use was the proximate cause of his injury; thus, it was Employee's burden to prove, by clear and convincing evidence, that his drug use had no causal connection to the use or non-use of the e-stop. Based on the record before us, we conclude Employee failed to show he is likely to prevail in proving by clear and convincing evidence that his drug use was not the proximate cause of his injury.

## Conclusion

For the foregoing reasons, we reverse the trial court's order and remand this case for further proceedings.

FILED

April 20, 2018

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 9:00 A.M.



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Jared Kizer | ) | Docket No.   2017-07-0073 |
| | ) | |
| v. | ) | State File No. 81955-2016 |
| | ) | |
| Express Services, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Allen Phillips, Judge | ) | |

---

**Dissent - Filed April 20, 2018**

---

David F. Hensley, J., dissenting.

Respectfully, I disagree with my colleagues' determination that the employee failed to satisfy his burden of proof at the expedited hearing. In my opinion, the combination of the employee's testimony, the testimony of Pinnacle's lead technician considered with Pinnacle's investigative report and the TOSHA report, and the testimony of Dr. Ferslew and Dr. Figueroa, rebutted by clear and convincing evidence the statutory presumption that the employee's marijuana use was the proximate cause of his injury.

*The TOSHA Report*

In my opinion, the TOSHA report, excluded by the majority based on Rule 702 of the Tennessee Rules of Evidence, was properly considered by the trial court. The employer did not object to its admission into evidence based on Rule 702. That issue was neither presented to nor decided by the trial court. Moreover, the employer does not raise an issue on appeal involving Rule 702. It is not the role of the Appeals Board to address the issue in the first instance. *See Buckner v. Eaton Corp.*, No. 2016-01-0303, 2016 TN Wrk. Comp. App. Bd. LEXIS 84, at *12 (Tenn. Workers' Comp. App. Bd. Nov. 9, 2016) ("[I]t is not our place to address . . . issues [not resolved by the trial court] in the first instance on appeal.").

In its brief, the employer identified four issues for review, including "[w]hether the TOSHA report should have been admitted, and considered, as evidence under the <u>hearsay rules and public records exception</u>, pursuant to Tennessee Rules of Evidence 801-806, and 901-902." (Underline in original.) In the trial court, the employer's

1

objection to the report's admissibility was based upon the report's alleged untrustworthiness as a public record or report as contemplated in Rule 803(8). The employer presented several arguments to the trial court as to why the report lacked sufficient trustworthiness to be admitted into evidence, none of which addressed Article VII of the Rules of Evidence concerning opinions and expert testimony. In its brief on appeal, the employer presents the same arguments, asserting "it is the Employer's position that this should have been excluded under the hearsay rules, Tennessee Rules of Evidence 801-806, 90[1]-902." In my opinion, the majority should have limited its analysis of the admissibility of the report to the arguments presented to the trial court and raised on appeal.

Based upon the objections to the TOSHA report's admissibility, the trial court properly admitted the report and accepted "what the Court considers to be relevant." In presenting its arguments to the report's admissibility on appeal, the employer presents, in essence, four arguments, none of which, in my view, have merit. The employer asserts that (1) the report was not a certified public record and, therefore, cannot be self-authenticating as determined by the trial court; (2) the employer was not "part of this investigation and could not participate"; (3) the lack of information identifying witnesses and the injured employees and the hearsay within hearsay indicate a lack of trustworthiness of the information in the report; and (4) allowing the report in evidence is more prejudicial than probative.

Initially, it is to be noted that a trial court's decision regarding the admission or exclusion of evidence is entrusted to the court's discretion and will not be disturbed on appeal unless the trial court abused its discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). As the Tennessee Court of Appeals has stated:

> Generally in Tennessee, a trial court's ruling on the admissibility of evidence is within the sound discretion of the trial judge. Further, trial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant. A trial court's evidentiary ruling will only be overturned on appeal upon a showing of abuse of discretion.

*Green v. Smith*, No. M2006-01729-COA-R3-CV, 2008 Tenn. App. LEXIS 261, at *10 (Tenn. Ct. App. Apr. 30, 2008). Here, the employer does not allege or explain how or in what manner the trial court abused its discretion in admitting the report.

The trial court admitted the TOSHA report pursuant to Rule 803(8), Tennessee Rules of Evidence, which provides that "[u]nless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law

2

as to which matters there was a duty to report" are not excluded by the hearsay rule. The trial court determined the "stamped document is a self-authenticating document" as contemplated in Rule 901 of the Tennessee Rules of Evidence, specifically referencing the illustration in Rule 901(b)(7) of a public record or report. The employer asserts the report "was not a certified public record to make it a 'self-authenticating' document as the trial court deemed to be at the Expedited Hearing." However, the employer fails to cite any authority in support of its assertion that the report must be "certified," or that the report was not "certified."

Employer asserts it "was not a part of this [TOSHA] investigation and could not participate, as [the investigation] was against Pinnacle." However, the employer fails to cite any authority, nor are we aware of such authority, indicating an employer's failure or inability to participate in such an inspection is a basis for denying the admissibility into evidence of the report of such investigation. Accordingly, I find no merit in the employer's argument.

The employer next contests the report's admission into evidence based upon the report's alleged untrustworthiness as contemplated in Rule 803(8). The employer asserts the report includes "hearsay within hearsay statements," as well as "numerous statements that do not identify the witnesses by name pursuant to [Tennessee Code Annotated section] 50-3-302(d)." The employer additionally asserts there were numerous photographs throughout the report "that could not be authenticated to correspond to whether it was the machine that caused the injury." Finally, in regard to the report's alleged untrustworthiness, the employer asserts "because there is no witness identifiable information in the report, [the report] also does not indicate that any of these incidents [addressed in the report] involve [the employee] as he is not identifiable by name." I find no merit in the employer's assertion that the untrustworthiness of the report justifies its exclusion from evidence.

Based upon the Tennessee General Assembly's findings in the Occupational Safety and Health Act of 1972 that the "burden on employers and employees . . . resulting from personal injuries . . . arising out of work situations is substantial," the General Assembly established policies "to assure so far as possible" that workers have "safe and healthful working conditions." Tenn. Code Ann. § 50-3-102(a)-(b) (2017). The legislation authorized the Commissioner of the Department of Labor and Workforce Development ("Commissioner") to "[i]nspect and investigate . . . the places of employment, and question privately any employer, owner, operator, agent or employee." Tenn. Code Ann. § 50-3-301(2) (2017). Section 50-3-305 authorizes the Commissioner "to compile, analyze and publish . . . all reports or information obtained." Tenn. Code Ann. § 50-3-305 (2017). The TOSHA report in question includes numerous redactions marked "Witness Identifiable Information T.C.A. 50-3-302(d)." That code section provides that "[t]he name, job title and other information that may be used to identify a witness who is interviewed during the course of an investigation shall be considered

3

confidential and shall not be a public record pursuant to title 10, chapter 7." In my opinion, the redactions do not render the report untrustworthy.

The TOSHA report identifies Pinnacle as the company where it conducted its investigation. It identifies an accident "on 10/20/16 where an employee suffered an amputation of three fingers," and it notes "the interlock was tested" and "found to be inoperable on the filler box." This information, as well as the report's notation of "limited" employee training, is corroborated by the testimony of the employee, Mr. Phillips, and Pinnacle's report of its investigation. The TOSHA report notes that representatives of both the employer and Pinnacle "reported an amputation," and that the employer's report stated the "amputation . . . occurred on 10/20/16 at [Pinnacle]." The TOSHA report describes the event in details consistent with the testimony at the expedited hearing and Pinnacle's investigative report. Indeed, it describes Pinnacle's "Maintenance Technician" as having "tested the limit switch by raising the top and the machine cycled while the top was raised." Accordingly, in my opinion, neither the sources of the information in the TOSHA report nor the method or circumstances of preparation are indicative of a lack of trustworthiness sufficient to exclude report's admission into evidence.

Finally, the employer asserts that admitting the TOSHA report into evidence "is more prejudicial than probative as the information Employee sought to introduce was available via other means at the Expedited Hearing." I find no merit in this assertion, and the employer cites no authority or argument to support the assertion. While Rule 403 of the Tennessee Rules of Evidence allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice," the employer fails to articulate the manner in which the probative value of the evidence is alleged to be prejudicial or in which its probative value is outweighed by the danger of unfair prejudice. Moreover, the trial court limited its consideration of the report to "what the Court considers to be relevant." Accordingly, I do not believe the trial court erred by considering the relevant parts of the TOSHA report.

*Additional Background and Testimony*

The record includes relevant evidence that, in my opinion, was not adequately addressed or was not addressed at all in the majority opinion. In determining whether the employee presented sufficient evidence to overcome the applicable presumption, I am compelled to address this evidence.

As an initial matter, a more detailed description of the operation of the "splitter" machine is appropriate. Several sixteen pound blocks of frozen fish are fed into a "filler box," and a hydraulic "pusher" forces one block of fish at a time into the cutting heads, where the blocks are cut into smaller pieces. The machine frequently jammed as pieces of fish broke off the frozen blocks or the blocks became misaligned, which required the

operator to open the gate or door on the filler box. The evidence differed in terms of the frequency of the jams, with the employee testifying it occurred every day, several times on his shift. The TOSHA report indicated the employee reported having to clean out the filler box "on average of 3-4 times every [half] hour." Additionally, the report noted that employees working in this department rotate between machines, operating the different pieces of equipment in 30 minute intervals. It noted that other operators reported having to clean out broken pieces or realign the blocks "5-6 [times] during each 30 minutes" of operation. In addition, it noted that, due to the frequency of having to clean out the filler box, the task was considered "routine, repetitive and integral," such that "lockout would not apply."

The employee explained the process of clearing the machine as requiring "two hands to pick . . . one block of fish up, because it's . . . heavy." He testified that when the splitter jammed just before his injury, there were eight blocks of fish in the filler box. After removing the frozen blocks, he cleaned out pieces that had broken off the frozen blocks to allow the machine to continue its cycle. As he began putting the blocks of fish back in the filler box he "noticed one block was still sitting crooked," which he said would cause the block to break into pieces requiring him to "have to get back inside of it and unjam it again." He took the block out, then cleaned "the side wall" because he "noticed the wall was gunked up," and then he put the block back in the filler box. In doing so, he noticed it was still "a little crooked," and said "that's fine . . . you can throw a block on it and it will make it go down the rest of the way." He testified he "threw another one back on top of it – another block or two . . . and it – they were all still sitting crooked." He stated he pulled two of the blocks back out of the machine "[a]nd about the time I stuck my hand back down there, the machine had cut on and it pulled my hand inside the machine." The employee's hand was not drawn into the cutter head; rather, the hydraulic pusher caught his right hand between a frozen block of fish and the frame of the filler box, amputating three of his fingers and causing severe injury to his right little finger.

Turning to the employee's drug use, his testimony regarding how often he smoked marijuana was somewhat unclear and inconsistent. The majority notes that although he testified in his deposition that he did not smoke marijuana on the day of the accident, "he testified at the expedited hearing that he had smoked a joint the morning of his injury." The majority also notes that he "was unable to testify with any certainty regarding how much he smoked." However, there is no evidence or suggestion that, on the day of the accident, the employee smoked more than "one joint" at about 7:15 in the morning. He testified he had to be at the farm where he worked a second job at 8:00 o'clock on the morning of the accident, that he usually got up at about 7:00 o'clock, and that he had time to eat breakfast "and then I'd smoke, and then on off to work an hour later." When asked whether he was feeling the effects of having smoked marijuana when he started his shift at Pinnacle at 4:00 o'clock that afternoon, he stated "not after working at the farm and coming home and taking a shower and taking a nap, taking a short nap, no, sir." He

5

testified he did not feel like it affected his job performance in any way that evening, and that he was not impaired in any way when the accident occurred.

The majority also fails to include significant testimony of Phillip Miller, the lead maintenance technician for Pinnacle. In addition to the testimony identified in the majority opinion, Mr. Miller testified,

> Q: After his injury, were there any modifications made to the machine on which he was injured?
>
> A: Yes, sir, it was.
>
> Q: What modifications were made?
>
> A: Prior – just the same night in which he was injured, they had us bolt down the hood of the – both splitters, and actually all splitters in the facility so that you couldn't, by hand, just lift the hood of the splitter without removing the bolt due to the positioning of the interlock switch where it was – where it was mounted was improper location. But that's how it was designed.

Mr. Miller testified the interlock switch "kills the circuit," which shuts the machine down. He testified the "door" on the machine can be raised to gain entry to where the blocks of fish are located and when the door is raised to a certain point the interlock kills the circuit. When asked whether he was saying it was a poor design, he testified, "[c]orrect." When asked "what would it allow employees to do," he responded, "[t]hat switch, from the original design point, would allow employees to access the entry in which product was and the machine still run." He was asked whether that was something employees did and said, "[y]es. That was a common thing." He agreed that was something employees did on a regular basis and that the manner in which he thought the employee raised the door with one hand while reaching in with the other hand "was routinely done by other employees."

The majority includes Mr. Miller's cross-examination testimony concerning how he thought the accident occurred; however, it excludes the question and Mr. Miller's response concerning whether the interlock switch allowed the machine to cycle on when the hood was only partially raised.

> Q: Tell me how, based upon your investigation, your review of these working parts of this machinery, how this machine – how this accident had to have occurred?

6

A: Okay. Well, when I first approached the machine to inspect, the first thing was we checked the E-Stop. Killed – hit the E-Stop and killed the machine and pulled the E-Stop. Started it back up. And the next thing we was [sic] checking was the interlock switch on the hood. We found that you could actually – due to the distance, which were [sic] the hood and the main contact with the secondary device on – to kill the complete interlock, you could actually hold the hood in between point and reach in. And by holding it in between, the machine still would cycle.

Q: Okay. And it's my understanding that machine is probably not supposed to do that, is that correct?

A: Correct.

This testimony is consistent with the findings in the TOSHA report. "The filler box top was equipped with a limit switch that if the top is opened even slightly; it is supposed to keep the machine from operating. When the [Compliance Safety and Health Officer] had the limit switch tested the day of the inspection [October 24, 2016]; it was found to be inoperable." Furthermore, the report noted that during the inspection "[t]he Maintenance Technician tested the limit switch by raising the top and the machine cycled while the top was raised."

Mr. Miller further testified that, because the second shift was inadequately staffed with Pinnacle employees, there were a number of temporary employees working the machines, and that Pinnacle did not provide adequate training to those employees.

Q: Okay. Were there any real procedures shown to temp workers how to correct such an issue [as the machine becoming jammed] at the time of Mr. Kizer's injury?

A: No, sir.

Q: Were they essentially just kind of put in front of a machine and maybe shown how to operate it and handle whatever comes?

A: Yes, sir.

Q: In your opinion, you don't think Mr. Kizer violated any kind of safety protocols or policies at the time of his injury?

A: No, sir. As I indicated, I think he was basically doing what he's seen, whoever may have given him a brief period of training or whatever. He's seen what he's seen done before on a routine basis.

7

The employee's testimony concerning the training he received to operate the splitter machine likewise indicated the training was very limited.

Q:     Okay.  Tell us, if you will, about any training that you received when you – not in pizza but when you moved into the fish station at Pinnacle, what kind of training did you receive to operate those machines?

A:     The only training I received was they just showed me basically how to run the machine, how to load it, how to stop it.

. . . .

Q:     In rearranging these blocks of fish product, were you taught to do it that way, so to speak?

A:     Yes, sir.  That's the way they taught me the first day.

Q:     And is this something you saw other employees do-

A:     Yes, sir.

Q:     -to address that problem?

A:     Yes, sir.

Q:     Okay.  And this is something – had you done this before to address that issue?

A:     Yes, sir.  A million times.

Q:     Okay.   And when you had done that before, had you been reprimanded or corrected in any way?

A:     No, sir.

*Expert Testimony*

I also believe additional deposition testimony given by Dr. Ferslew, the pharmacologist and forensic toxicologist, and additional deposition testimony and an affidavit from Dr. Figueroa, the treating emergency room physician, were material and relevant to the issues.

8

In addition to testifying that the presence of THC in the employee's urine only confirmed his prior use of marijuana and did not prove he was or was not under the influence at the time of the injury, Dr. Ferslew was asked about his research concerning the effects marijuana might have on different individuals and the length of time or duration of its effects. He testified about the pharmacodynamic response in relation to the concentration of THC, stating a response "can occur with standard dosage up to four – two to four hours, depending on dose – and that's a dose dependent measure, can be impaired for up to two to four hours after smoking." He added,

> [n]ow, with higher concentrations that are available today, with the advent of the legalization and other issues in this country, we have even higher concentrations of THC containing marijuana. That period probably could be extended. But most toxicologists, at least the ones I work with in my discipline, will agree that impairment occurs for a period of two to four, maybe up to six hours, after use.

When Dr. Ferslew was deposed, the employee had already been deposed. Based upon the employee's deposition testimony stating he last smoked marijuana the day before his injury, Dr. Ferslew was asked to assume that the employee had not smoked marijuana on the day of his accident, but had smoked marijuana the day before, and whether he would expect the employee would "still have any lasting effects on him the day after he did it." Dr. Ferslew replied, "[t]he period of time is too long. No, he would not be under the influence of THC at the time of the incident." Based upon Dr. Ferslew's testimony as to the period of time impairment can continue following marijuana use, it is reasonable to conclude the period of impairment following the employee's smoking marijuana on the morning of the accident would not have extended to the time the employee began his shift at 4:00 o'clock that afternoon, or to 9:00 o'clock that evening when the accident occurred.

The majority gives little mention to the testimony of Dr. Figueroa, the emergency room doctor who treated the employee immediately following the accident. The majority notes that he "stated he did not observe any outward signs of intoxication," and that he "admitted he could not state whether Employee was impaired 'in another way.'" In my opinion, Dr. Figueroa's deposition testimony and his affidavit are significant. No fewer than four times he stated the employee was not impaired. His affidavit stated "[a]t no time during my evaluation and examination of Mr. Kizer did I find him to be intoxicated or cognitively impaired in any way." He testified similarly in his deposition.

Q:     Did he seem to you to be impaired in any way whatsoever?

A:     Not to me.

. . . .

9

Q:     Okay.  And again, when you saw him within 30 minutes of that injury or accident, he in no way appeared to be impaired to you?

A:     No, he did not.

Q:     And you feel comfortable that you can recognize when a patient is impaired, correct?

A:     That is correct.

. . . .

Q:     Okay.  And so even through reading these records and through your memory of treating Mr. Kizer, you don't remember any indication of being – him being impaired within 30 minutes of his injury; is that correct?

A:     I don't think he was impaired.

### *Employee's Burden of Proof*

Having a positive confirmation of the urine drug screen, Tennessee Code Annotated section 50-6-110(c)(1) (2017) required the employee to present "clear and convincing evidence that the drug . . . was not the proximate cause of the injury" in order to rebut the statutory presumption to the contrary.  "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence."  *Claiborne v. ABC Grp. Fuel Sys.*, No. M2008-02292-WC-R3-WC, 2009 Tenn. LEXIS 734, at *13 (Tenn. Workers' Comp. Panel Nov. 20, 2009).  Stated another way,

> [t]he clear and convincing evidence standard requires that the truth of the proposition sought to be established by the evidence be highly probable.  Clear and convincing evidence leaves no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence.  Thus, clear and convincing evidence produces in the fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established.

*Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 555 (Tenn. 2008) (superseded by statute on other grounds) (citations omitted).

The analysis of the evidence here begins with the presumption that the employee's marijuana use was the proximate cause of his injury.  The "proximate cause" of an injury has been defined in various ways, including "the act or omission which immediately causes or fails to prevent injury which would not have been inflicted in the absence of

10

such an act or omission occurring or concurring with another." *Solomon v. Hall*, 767 S.W.2d 158, 161 (Tenn. Ct. App. 1988). Stated another way, "[a] proximate cause of an injury is a cause that produced the result in continuous sequence and without which it would not have occurred." *Id.* Moreover, "[t]here is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991) (reversed on other grounds). Thus, the analysis begins with a presumption that the employee's marijuana use was a substantial factor in producing his injury.

It is undisputed that the employee regularly smoked marijuana, and he was unable to describe with accuracy how often he smoked. However, there is no proof that he smoked marijuana less than thirteen hours before his injury, and he denied doing so. Dr. Ferslew testified the effects of marijuana generally wear off within 2 to 4 hours, "maybe up to six hours, after use." The employee testified that he was not feeling any effects of marijuana usage when he started his shift at 4:00 o'clock in the afternoon on the day of his injury and that he did not think it affected his job performance that evening. He testified he did not feel like he was impaired in any way when the injury occurred and pointed out that he had performed his job for five hours before the injury occurred.

The trial court noted the employee's testimony that he operated the machine on the day of his injury in the same way he operated it "a million times." The employee said he was "taught" to operate the machine the way he did. The trial court emphasized that "Mr. Miller corroborated that employees on Mr. Kizer's shift 'routinely' performed the same action as Mr. Kizer." The trial court found "highly probative" Mr. Miller's testimony that he "did not believe Mr. Kizer violated any safety protocols and noted that virtually all second shift employees were 'temps,' lacking proper training in the splitter machine's operation."

Although there was evidence that had the employee engaged the E-Stop, the machine would not have cycled on, the trial court nonetheless found that the machine's safety devices did not function properly. The TOSHA report corroborated the finding in Pinnacle's incident investigation report that the interlock adjustment "allowed the guard to travel some distance prior to it activating and shutting off equipment thus allowing [the employee] access to the product area." As noted in the TOSHA report, "[t]he filler box top was equipped with a limit switch that if the top is opened even slightly; it is supposed to keep the machine from operating." The trial court determined that, "even without the TOSHA report, the Court still concludes the machine's safety devices failed to protect Mr. Kizer based upon Mr. Miller's testimony." The trial court found that the machine should not have cycled when it did, "irrespective of Mr. Kizer's earlier marijuana usage." The trial court's factual findings are presumed to be correct, and I conclude from my review of the evidence that the preponderance of the evidence supports the court's factual findings.

11

But that does not end the inquiry. While it is presumed that the trial court's findings of fact are correct, unless the evidence preponderates otherwise, whether the facts establish clear and convincing evidence to overcome the statutory presumption that the proximate cause of the employee's injury was his marijuana use is a question of law that is reviewed de novo with no presumption of correctness. *See Mansell v. Bridgestone Firestone N. Am. Tire*, 417 S.W.3d 393, 410 (Tenn. 2013). In so doing, the focus is on the evidence offered to rebut the presumption, which must address the cause of the injury.

As heretofore stated, in my opinion, the combination of the employee's testimony, the testimony of Pinnacle's lead technician considered with Pinnacle's investigative report and the TOSHA report, and the testimony of Dr. Ferslew and Dr. Figueroa, overcomes the presumption that the employee's marijuana use proximately caused the injury. In my view, and considering the factual findings made by the trial court, there is no serious or substantial doubt as to the correctness of the conclusion to be drawn from the evidence. It is not necessary to conclude whether the proximate cause of the employee's injury was the failure of the interlock safety switch to operate properly, allowing the machine to cycle on when the door was partially opened and the employee's hand was inside, or the failure of Pinnacle and/or the employer to train the employee in the appropriate manner in which to safely operate the machine, or some combination of the two. However, to affirm the trial court's determination to award the employee benefits at this stage of the litigation, it is necessary to conclude that the employee rebutted by clear and convincing evidence the presumption that his marijuana use was the proximate cause of his injury. In my opinion, he did so. I would affirm the trial court's decision.



**FILED**

**April 20, 2018**

**TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD**

**Time: 9:00 A.M.**

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Jared Kizer | )  Docket No.  2017-07-0073 |
| | ) |
| v. | )   State File No.  81955-2016 |
| | ) |
| Express Services, Inc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Allen Phillips, Judge | ) |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 20th day of April, 2018.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| Spencer R. Barnes | | | | | X | spence@morrisonandbarnes.com |
| Gregory H. Fuller | | | | | X | ghfuller@mijs.com |
| Allen Phillips,  Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X |  Penny.Patterson-Shrum@tn.gov |

*Matthew Salyer*

Matthew Salyer
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov